Our next case on the call of the docket is agenda number 8, case number 113676, McFatridge v. Madigan. Counsel for the appellant, please proceed. Thank you and may it please the court, Michael Skodro from the Illinois Attorney General's on behalf of the defendant in this case. Your honors, plaintiff here asked this court to add an exception to the Illinois Employee Indemnification Act. And under that exception, non-judicial elected officials alone would have the entitlement to a state-funded defense in a civil case that arises even from the most egregious, indeed even criminal, misconduct. That principle cannot be reconciled with the plain language and structure of this statute. Second, it runs afoul of this court's case law defining public policy in Illinois and, more precisely, defining the limits on the expenditure of public funds for private purposes under Article 8, Section 1A of the Illinois Constitution. And third and finally, the argument that plaintiff advances asks this court to engage in precisely the kind of cynical presumption that a state official is going to perform her duties in bad faith. And more specifically, that the attorney general would do so in a manner that is inconsistent with long-established case law in this court that gives her unfettered discretion to make litigation decisions on behalf of the state of Illinois. I notice that some of the arguments in your brief are different in some ways from the ones that are contained in your petition for leave to appeal. Under the court's rules, aren't these arguments forfeited? No, Your Honor. We use the same phrase screening function on page 17 of our petition for leave to appeal. That's the argument that plaintiff claims is somehow not properly before this court. And more importantly, that argument is indeed, runs through this case from start to finish. That same phrase appeared on page 150 of the common law record in this case, even in the circuit court filings. More importantly, it's the theory that's in play here. We refer to it as a screening function as a shorthand for the first sentence of paragraph 2B, as a measure of efficiency. The argument that the attorney general has the discretion to make the determination of whether there has been willful or wanton misconduct or conduct outside the scope of employment, that has been a consistent theme that has run through all of the filings in this case. And there was also a quibble with the reference to legislative history. There was concern that that would not be publicly available. As we point out in our reply brief, legislative history is publicly available on the website. And in any event, defendant attached all of the relevant history to their opening brief in this case. And if anything more were needed, as this court made clear in its J.P. Morgan decision in 2010, it paid 462 of that decision, makes clear that a party can't forfeit canons of construction. Because the court doesn't want to be in the position, understandably, of issuing one interpretation of a statute in one case. And then only to issue a very different interpretation in a later case, because the case was argued using different canons of statutory construction. So indeed, legislative history is something this court can refer to on its own, should it wish to. So there's certainly no forfeiture in the fact that that was added in. Our position, of course, is that the legislative history, while perfectly consistent with our argument, and notable for the absence of any discussion of what would be an extraordinary measure that would allow the taxpayers to pay, even in the event of criminal misconduct or other egregious misconduct in a civil case, we don't think the court needs to rely on legislative history to reach the proper result here. The plain language really ends the inquiry here. And I'd like to begin there. Section 2 is fairly straightforward as it pertains to this case. Section 2A sets out the general duty on behalf of the attorney general to represent state employees who are sued civilly. And then the first sentence of 2B provides this screening function. It says the attorney general shall determine at the outset whether or not there was misconduct, intentional, willful, wanton misconduct in the case, or whether the actions taken by the state, the employee defended in the civil case, were undertaken outside the scope of his or her employment. And this is, of course, necessary. Here's the General Assembly ensuring that public funds are not going to be spent for private, improper purposes. They could have taken a different path. They could have done what they did in the corporate code, as we point out in our brief, and what a handful of other states have done, namely, you get unfettered access to money at the outset, but then at the end of the day, that employee is legally obligated to reimburse the state or the private employer for every penny that was spent on their defense, if at the end of the day it's determined that they acted willfully and wantonly. The General Assembly opted not to impose that burden on state employees. Instead, to ensure that public funds were spent in a public way, they had the screening function at the outset. So that's the first sentence of 2B. Later in 2B, there's a backstop. And I should add that the Attorney General was designated, not surprisingly, as the person who would be the gatekeeper here, as this Court has made clear time and again, as far back as the IEPA versus PCP case, and far more recently in the Lyons versus Ryan decision that is cited in one of the amicus briefs, this Court has made clear time and again that when it comes to litigation decisions on behalf of the state, the Attorney General has unfettered and sold discretion as a constitutional matter. It's a linchpin of our constitutional system. So it's no surprise she was delegated to make that decision. Well, then later in that same paragraph, the first paragraph of 2B, there's an additional backstop. It doesn't need to be there, but it is. There's additional protection that in the event the Attorney General makes the determination at the outset that there is either intentional or willful misconduct or that there has been some activity outside the scope of employment, that's the basis of the suit, and therefore declines to provide a representation or to fund a representation. Well, then if at the end of the day, the factor of fact makes two findings, that there was not willful and wanton misconduct and that the conduct did occur in the course of employment, that's a backstop. And that employee then gets the full value of any judgment entered against him or her, plus all of the costs incurred in that defense. So you have the Attorney General making the initial decision. You have, in a sense, a review function in place in the form of the ultimate finder of fact. Now, I should note that as a practical matter, as a historical matter, the Attorney General over time has very rarely, it's my understanding, and talking to people I can talk to who have more longevity in the office than I do, that this has been a very rare occurrence that the Attorney General, she does on occasion, withhold funds based on a finding of willful or wanton misconduct. No one could recall another instance in which a former or present state's attorney had the money withheld. Although, as the Seventh Circuit made clear in this case, this was an exceedingly rare case with severe, serious and disturbing allegations. But in any event, that's how 2B works. And then there's the second paragraph of 2B, which says, I think not surprisingly, we're going to give added deference, recognizing the station of, out of respect for the station of elected officials, that they don't have to accept the only one attorney the state's going to offer to them. Should they choose, they can have their own attorney. And that's what the second paragraph of 2B says. There are two sentences. You get to choose your own attorney, and by the way, so long as the attorney is reasonably acceptable to the Attorney General, so long as their fees are reasonably acceptable to the Attorney General, you'll have that attorney paid for by the state. So that's what that paragraph does. Now, the contention by plaintiff is that that paragraph ought to do a lot more, that it ought to mean that the non-judicial, and when judicial is in 2C, which is really a critical part of how this all works together, but non-judicial elected officials, what that paragraph means is they only get to choose their own lawyer, but they're also exempt from the screening function that the General Assembly put in at the outset of 2B to ensure that money, public money was not going to be misspent on private purposes. But they're exempt from that, even in the event of an extraordinary misconduct, that they are entitled to a publicly funded defense. Now, if we look at nothing else, 2C alone refutes that theory. What does the General Assembly do in the very next paragraph, 2C? It says, notwithstanding any other provision. So it begins by making quite clear to the reader that unlike what's come before, this section is special. This is going to trump other things that exist in Section 2, notwithstanding any other provision, not a phrase that appears in the second paragraph of 2B, only in 2C. It goes on to say, well, essentially what 2C creates, as you look at it, it creates a different screening function for judges. It doesn't do away with the screening function by any stretch. What it says is, essentially, is when it comes to members of the judiciary, the screen for intentional or willful misconduct is, has there been a criminal trial that resulted in a conviction arising from this same misconduct? So the General Assembly wasn't going to say, they understood that there was, and I understand from the legislative history, this was, 2C was introduced at the behest of the AOIC, it wasn't a thought that we're going to do away with the screening function entirely and run the risk that public money will be spent unconstitutionally, or at least in a way that's antagonistic to public policy. No, the decision was, as to judges, we're going to craft a different screening function as to the willful misconduct rule. And what it is, is has this individual been criminally convicted for the very misconduct that is now the subject of this civil lawsuit? That's the screen for intentional or willful misconduct. What plaintiffs would like the court to rule is that notwithstanding the precise way in which the General Assembly went about making a different screen in Section 2C, that the second paragraph of Section 2B does the exact same thing by silence for all nonjudicial elected officials and goes much further, it doesn't just do what 2C does, it goes further than 2C does. Under the plaintiff's reading, an individual, an elected official who's not a member of the judiciary, who is convicted of criminal misconduct in office, and is then subject, say, to a civil RICO suit arising from that same misconduct. If plaintiff's reading of Section 2B is correct, the state taxpayers would have to fund the civil defense of that individual throughout potentially years of civil litigation. That cannot be what the General Assembly intended. And if there were any question from the face of the statute, the first line of 2B itself answers it. If 2C weren't enough, the first sentence of 2B is. The word employee is used twice in that sentence. This is the sentence that defines the Attorney General's screening function. It tells her what she needs to look for and do. That sentence uses the word employee twice. Well, employee is a defined term under the statute. Section 1B defines employee to mean both elected and non-elected officials. So if plaintiff were correct, it wouldn't just be that 2C doesn't make sense. It would also be, he's also asking the court to essentially amend the first sentence of 2B to say not employee, but non-elected employee, where the word employee is used. That's two clear strikes on the face of the statute that go against it. Now, the opinion below and the brief of the plaintiff don't confront those two strikes. Rather, the theory was that there is a way in which the second paragraph of 2B must entirely supplant the first paragraph of 2B. Now, it doesn't say it does that. It doesn't say, unlike 2C, notwithstanding any other provision, it doesn't say that it's creating a special set-aside rule. But that in itself, as we explained, simply cannot be the case. That alternative reading, not only does it defy the points we've already discussed, but it would do away with important points in the first paragraph of 2B that simply have to apply to all employees. And one of those is the special provision for conflicts of interest. We described that in detail in our brief. The other even more important provision that's in the first paragraph of 2B is the provision that is the second half of the attorney general screening function. She also screens out cases involving conduct outside the scope of employment. Now, there's been no dispute in this case. The appellate court agreed. Plaintiff agrees. We certainly agree. It would be unlawful to allow a suit to proceed, a taxpayer expense, when the underlying conduct occurred outside the scope of state employment. And what the plaintiff has said is, well, but that restriction on the application of the act also appears in paragraph 2A. That's true. But it's only the first sentence of 2B, the AG screening function, that gives operative effect to that restriction. It's that sentence and that sentence alone that says the attorney general shall decide, shall screen out cases in which the underlying conduct occurred outside the scope of employment. So if the second paragraph of section 2B entirely supplants the first paragraph, well, then out the window goes the only provision in the act that allows someone to screen out cases involving conduct that occurred outside the scope of employment. So for all of those reasons, it is impossible to square their reading with the plain language of the act. If that weren't enough, as this court held in right, which we cite at length in our brief, it is a misuse of public funds in the constitutional sense under Article 8, Section 1A, it is a misuse of public funds to have taxpayers pay for the defense of a public official guilty of criminal misconduct. Now, in that case, they were criminal charges. And that is a difference between that case and this one. This one. But I would argue that difference is not of constitutional moment. It is hard to imagine that right comes out differently. If instead, if the individuals in that case had engaged in the exact same serious, egregious misconduct and abuse of office, but instead had been sued civilly or later had been sued civilly for the very same misconduct, it is hard to imagine that the constitutional inquiry would turn on that choice the way in which the case proceeds. And that instead, had it been a civil case with the same misconduct, that would have been fine as a constitutional matter. If one accepts that, then right stands for more than just the proposition that you cannot use public money to defend someone who is in a criminal proceeding. What is your reading of Tully versus Edgar and how does, and doesn't that control this case? Not at all, Your Honor. Tully involved the question of whether or not when there are cases where you have a private counsel paid for by the state instead of the Attorney General's office representing you or a state lawyer representing you. What does that mean in terms of some of the language that occurs at the bottom of paragraph 2A? That language requires someone who is getting, who is being defended by the state to cooperate in the process of that defense. And the, Tully simply holds, and I should add that Tully doesn't rely solely on statutory construction. Page 843 of Tully makes very clear that it is relying in part also on canons of ethics. And is saying, look, if you have a lawyer who is not a state lawyer, that lawyer has to be free to make decisions on behalf of his or her client in that case and doesn't have to, as Tully would say, doesn't have to then agree with decisions made by the state as to how that defense should be run. There's nothing about that case that has a remote application to this case, Your Honor. There's a claim being made that somehow that case says, well, the parts of the statute don't necessarily work together. You can't move one to the other. We're not asking to do that at all. We're asking that the statute be read on its face and that its plain language be followed and that it be read in a way that doesn't run afoul of constitutional prohibitions. If Wright does anything, at the best, Wright at most, I should say, Wright would make unconstitutional the reading the plaintiff proposes. Even at least, Wright would cast constitutional doubt onto that reading. And we know as an established basis of statutory construction, an established canon, that such constitutional doubts are to be avoided. What's the significance of the fact that each of these paragraphs start with the phrase, in the event that? Yeah, Your Honor, that's mentioned in the brief. I don't see that as in any way, I don't know how it adds to the inquiry here, Your Honor. Yes, it's a condition. In the event that this is happening. So if we look at the second paragraph of 2B, it's making clear that in the event that there's an elected official, you get two additional benefits. Namely, an attorney and the attorney is paid for by the state. But I don't see any other way in which that can affect the plain reading of the statute. You don't think it sets up separate, discrete scenarios? I don't, Your Honor. And I think if any conclusive proof were needed, it's the first phrase of 2C. The General Assembly knew precisely how to do what Your Honor suggests, and when it says notwithstanding any other provision of this section. That's what it did. I think in the event can be read to say nothing more than, under these circumstances, this applies. And that's exactly, we agree with that. Under these circumstances, this applies. Nothing in the first paragraph of 2B says, for example, except as, under the next paragraph, there's no suggestion. And to do something as extraordinary as what's being suggested here, which is to immunize, or rather have the public fisc, the taxpayer fund, even these rare instances of egregious misconduct in office, something far more than that would be needed. And again, I don't know how that reading is reconciled with what the court, the General Assembly did in 2C. Or frankly, why 2C was even necessary if that reading of 2, of the second paragraph of 2B is correct. In my remaining minute, Your Honor, I would just want to add that there is a third category of error that's in play here. The entire premise of the argument here is that an elected official is going to act in a way, or may act in a way, that is contrary to her statutory and constitutional duties. This court made clear in Sundance Holmes that that is not a permissible premise on which to build a legal rule. And that is a general matter for any public official. At this- What kind of screening does the Attorney General have to perform? In other words, are allegations alone sufficient? Anytime a complaint says, Wolf, Wynne-Wanton? Sure. Say I'm not defending it? Your Honor, the statute requires that she determine. And this is perfectly consistent with the unfettered discretion she has, as this court made clear in Lyons and other cases, whenever making litigation decisions on behalf of the state. So in that sense, it says she has to determine. I can tell you that, as I alluded to earlier, because this is the rare case where anything is withheld, notwithstanding the fact that, of course, there will be allegations in many cases of more egregious misconduct, there's not a reliance on simply what is in the complaint. And indeed, the word determines, I think, suggests that something more is going on and should be going on than simply a look at the complaint. I see my time has expired if the court has no further questions. Thank you. Good morning, Justices. My name is Terry Echol. I represent the appellee, Mike McFatridge, who is the former elected state's attorney of Edgar County. And I appreciate the opportunity to speak before you today. As we all know, this case is largely going to be driven by statutory construction. Parties obviously have a disagreement as to how this court should interpret the State Employee Indemnification Act. The Attorney General makes a number of arguments which they contend support their interpretation of the statute. Counsel just spoke for a while. His briefs all make reference to this public policy argument, which he contends supports their interpretation of the statute. They contend generally that you can't use public funds to defend willful and wanton misconduct because that would violate public policy. In listening to his argument, the basis of his public policy argument appears to assume that it's factually correct that Mike McFatridge engaged in willful and wanton misconduct. It's not true. What existed at the time the defense was denied, what exists today, were allegations in a complaint, nothing more. Justice Freeman was correct. This argument about an essential screening process was an after-the-fact argument made by the Attorney General. But the truth of the matter is that the state of Illinois, through the Attorney General, denied this elected state's attorney a state-funded defense because of allegations in a civil rights complaint under Section 1983. I don't think I need to remind this court, is that every single civil rights complaint that is filed against a state employee must allege willful or deliberate disregard of a known constitutional right. Negligence is insignificant. So every time there is a 1983 action filed against the state official,  there is a willful misconduct. Every time- Mr. Eccle? Yes, Your Honor. What about, is that cured? I mean, assuming for purposes of argument, your argument, that the screening process is deficient. It's just looking at willful and wanton allegations in a complaint. Is that taken care of by the backstop provision, as Mr. Scodro called it? It is not, Your Honor. There is no way when you have a civil rights case, such as the one we have in this case, involving hundreds of depositions, hundreds of thousands of pieces of paper, to tell a state's attorney, Mr. McFattridge, you have to use your own funds. You have to defend yourself. You have to essentially bankrupt yourself to defend yourself. And then later on, if it's determined you did not engage in willful and wanton misconduct, we'll go ahead and pay you back at that point in time. I think, Your Honor, that argument made by counsel is devoid of an understanding of just how expensive this type of litigation is. So in my opinion, that in no way cures the problem. Today, the Attorney General tries to tell us that there was this essential screening process. Well, as part of the record in this case, it's C-115, is the letter that was written by Barry Gross in the Attorney General's office on July the 5th, 2005, where he states that the representation must be declined because the acts and omissions which gave rise to plaintiff's claim involve allegations of intentional, willful, and wanton misconduct on your part. What happened in this case was the Attorney General denied my client a paid-for defense because of allegations in a complaint. If we should agree that the Attorney General can screen, can determine, is it within the purview of this court at this time to determine whether that screening was adequate, as you seem to be arguing it was not? Your Honor, I think you can take into consideration the lack of, as Justice Garment said, the lack of any type of definition, any type of guideline, criteria, the lack of that in the statute to assist you in determining legislative intent. If, in fact, with a elected official who could be subject to partisan politics, there was going to be this screening process available, then that should have been laid out in some type of detail. What is the process going to consist of? Is it just looking at a complaint? Is it just looking at allegations made by some plaintiff in some civil rights case? Is that going to be sufficient or not? So I think it's important in terms of determining legislative intent. Now, the Attorney General argues in support of their interpretation of the statute that essentially the legislature knew that there was a public policy prohibition over using public funds to defend willful and wanton misconduct. That seems to be a really big part of their argument. Well, let's see if that's, in fact, a valid argument. Let's see if the actions of the Attorney General in this case, and I don't mean this as a personal attack on anyone, are consistent with the fact that they consistently maintain the position that you may not use public funds to defend a state official who is alleged to have engaged in willful and wanton misconduct. Now, as part of the record in this case are the complaints that were filed by former criminal defendants, Steitel and Whitlock, who were the plaintiffs in the civil rights case. They allege in their complaints two aspects of conspiracy. One involving certain Paris police officers and an Illinois state police officer by the name of Jack Echarty. It is alleged in that portion of the conspiracy that those police officers engaged in misconduct by essentially feeding information to a witness and getting that witness to make false statements. It's alleged that my client, the state's attorney, learned of that and did not disclose it during discovery. There is also a portion of the complaint that deals with a vast number of Illinois state police officers who are alleged to have participated in the cover up of information that would have exonerated both defendants, that having occurred after the conviction. Now, the attorney general tells us about this screening process and how they can't use public funds to defend allegations of willful and wanton misconduct. Let's see if that's true. In the appellate court decision, they felt there was a concern that was evidenced by the legislature over arbitrary use of the power by the attorney general. In this case, the attorney general who claims to have screened the case and claims to have this public policy that they can't use public funds to defend allegations of willful and wanton misconduct, what did they do? They defended all of the state police officers. Every single one of them. Every single Illinois state police officer who is alleged to have actively covered up exculpatory, exonerating evidence. And who did they decline to represent? The state's attorney who allegedly knew about certain information and failed to disclose it. Later, the attorney general settled the case against Steudle on behalf of the Illinois state police and used more taxpayer funds on behalf of those Illinois state police officers. And they tell you that they can't defend McFatridge because of an allegation of willful and wanton misconduct. Mr. Reckler, are you asking this court to come up with some type of opinion that they're stopped? Because the primary emphasis, at least in the argument before, this court was the plain language. And are we going to get to questions like did the General Assembly know what they were doing and 2C knew exactly how to carve out an exception for willful and wanton for judges when they didn't in 2B? And I think I heard later on in the argument where Mr. Scodro said that your reading of the statute would render 2C superfluous, basically. That there would be no need because judges would have been covered under 2B if they were to cover them. So are we going to get into the plain reading or is this primarily an argument that in light of the facts of this case there should be a stop from coming under the statute? Because the first thing we have to look at is the plain language. I think really the court should resolve this on the plain language of the statute. And I think the thrust of my argument should go primarily to legislative intent. And Mr. Scola seems to be arguing that the legislature knew that they can't use public funds if there's allegations of willful conduct. So the court should consider that information that they say the legislature had in interpreting the statute. I also think based upon the facts of this case that there should be a stop from arguing that there was willful and wanton misconduct on behalf of Mr. McFatridge. And I think really, Judge, when you look at 2B, you look at how it's carved out. 2A talks about state employees, okay? That obviously includes both elected officials, non-elected officials, and judges. Then the second paragraph of 2B carves out a subset of state employees, the elected officials, and gives them certain additional rights and powers. And then Section C carves out certain additional rights beyond the second paragraph of 2B on behalf of judges. And I don't think it's really necessary to read anything more into how the legislature drafted that statute other than the determination that first paragraph of 2B, all state employees, second paragraph, elected officials, 2C, the judges. Mr. Echolm, may I ask you a question, another question about that provision? Again, the language saying, in the event that the defendant in the proceedings is an elected state official, including members of the General Assembly, the elected state official may retain his or her attorney, provided that said attorney shall be reasonably acceptable to the Attorney General. And in such cases, the state shall pay costs and fees to the extent approved by the Attorney General as reasonable as they are incurred. How does that affect this case where, clearly, the Attorney General did not find counsel acceptable and did not approve fees as they were incurred? It's been a huge problem, Your Honor. Back when this case first occurred, or strike that, when it was first filed back in 2005, based upon the letters that were sent, a request for defense was submitted to the Attorney General who declined to represent Mr. McFatridge as I previously indicated and I think we all know. At that time, there were two insurance companies that arguably had to cover the cost of the defense. Those two insurance companies filed declaratory judgment actions saying we don't have coverage. And for a period of time, those insurance companies, in fact, funded the defense. I have represented Mr. McFatridge since 2005. About sometime, I think, 2007 or early 2007, one of the insurance companies won their declaratory action and was out. From that point on, they refused to pay. The second insurance company also said we think our issues are the same. We declined to pay. We then tendered the case back to the state of Illinois. They refused to pay. For two and a half years, Your Honor, Mr. McFatridge had no one paying for his defense. My firm continued to represent him under the hopes that someday that we would be paid in connection with this case. We certainly had the option of abandoning the defense of the case and I think that part of the argument that we had previously made is Section 2D, which is the indemnification statute, is different than the language of 2B's second paragraph. And there is a really strong argument that even if the state of Illinois could decline to provide a defense for Mr. McFatridge, they're still on the hook for the judgment. But McFatridge continued to have my firm representing him. So it's kind of a long answer to your question, I know, but it's been a huge problem. What was the basis of the insurance deck actions for no coverage? For no coverage, on the one where there was no coverage, it was taken out by Edgar County, Illinois, and the first policy covered all members of the sheriff's office involved in law enforcement, I think that's the way it was termed. And the district court determined that that did not include McFatridge or the state's attorney's office, Seventh Circuit affirmed. The second policy was written slightly different, where I think it referred only to law enforcement officials. And ultimately. So it was the scope of the definition of who was insured? Yes. Not the alleged conduct? Not at all. Okay, thank you. You're welcome. I think it's perfectly reasonable in light of what I have just told you about the decisions that were made by the attorney general to defend the state police officers who were alleged in the complaint to have been actively involved in covering up evidence, to defend them, and refused to defend the guy, the state's attorney who allegedly knew about it, but didn't disclose it to defense when they said, the appellate court in this case, there was reason to conclude that the legislator sought to protect elected officials from the arbitrary denial of the payment of attorney's fees based upon partisan considerations. I agree. I think that decision and that finding of a concern was realistic on the part of the appellate court and a part of the legislature. Mr. Eccle, help me understand your argument with regard to the subset of paragraph B, the second part, if we look at that line. Are you saying that that's a completely separate type of situation, or does that not refer back to the earlier part of B? And I ask that question because it starts out by saying, in the event that the defendant in the proceeding, which seems to me to harken back to the first part of it. Your Honor, I think that, in my opinion, when they start in the event, as Judge Garmon had referenced, I think they were saying something. What they were saying is that elected officials are going to be treated differently. And I think the appellate court found that because of concerns over partisan politics. Now, section 2A, clearly, you know, we're all trying to determine legislative intent. And the legislative intent clearly was that for the elected official to be covered, it has to be essentially within the scope of his duties. So that portion of 2A has to apply to the second paragraph. But as the appellate court said in this decision, if the legislature intended and wanted to provide to the Attorney General this ability to decline coverage to elected officials, they could have said that in the second paragraph of 2B, after the words in the event, by adding three or four additional words in there. And they declined to do that. They decided not to do that. So I don't believe that the first portion of 2B applies to elected officials. Can you respond to the argument that the first part of 2B describes employees and that 2A defines employees as elected officials? How do we reconcile that? I think 2A clearly refers to all state employees. And I think the first paragraph of 2B is referenced to a category called state employees and that the second paragraph is a subclass or a subcategory being the elected officials. Just to help me get now. The definition of employee that's provided in A says elected officials. Yes. In B, the expression employee is used, which would, the definition includes elected officials. Correct. So at least in B, it would appear that the language would be consistent and mean elected officials. The second paragraph of 2B. Or the first paragraph. The first paragraph of 2B, it refers to employees. That has been defined as elected officials. The first portion of 2B where it talks about employees, in my opinion, the way the statute is drafted, is not intended to include elected officials. So I don't believe the first paragraph of 2B was intended by the legislature to include elected officials. They're covered under the second paragraph of 2B. Despite the initial definition in 2A? Yes. I think we all agree. This statute sure could have been written a lot better and a lot clearer. But as I know I'm running short on time. I just wanted to go back to that placement though. So you're saying it's significant that the placement of the second paragraph in subsection 2B of the statute, it's a significant placement? Yes. It has something, what does the placement have to do with that? I think it was an intent on the part of the legislature to create different rights for partisan elected officials from other state employees. And I think as the appellate court said, if the legislature intended elected officials to be treated the same way in terms of the ability of the Attorney General to deny coverage, they could easily have said that in the second paragraph of 2B as well. Okay. I think I'm out of time. Thank you very much. Thank you. Thank you, Your Honor. I'll respond to a few of the points raised. We actually very much agree that employee is used in the beginning of 2B to mean all employees. And as opposing counsel said, when it comes to the subparagraph, we're talking about a subset. But that subset has the special additional protection of having a lawyer of their choice. But it does not disturb. There's nothing in there to suggest it disturbs to the first paragraph of 2B that it will have to apply as the word employee is intended to mean, as defined to mean would include elected officials. Opposing counsel made the point that 2A talks about the fact that this cannot apply to conduct that occurs outside the scope of employment. Again, as I said though in the opening, it's only the first sentence of 2B that uses the word employee and therefore includes elected officials as well. That's the only place in the statute where someone is entrusted to make that decision. So it may be fine to say in 2A that it only applies to conduct that occurs within the scope of employment, but it takes the first sentence of 2B to give any practical effect to that prohibition. There's been some discussion about this very case. I should remind the Court, there's been no request in this case that this Court in any way modify the standards for the Attorney General. The word determined is used. The Court must presume good faith on the part of the Attorney General. That is not only consistent with the broad holding or language and part of the holding in the Sundance Holmes case. Beyond that, that is part and parcel of cases like Lyons and IEPA versus PCB that recognize that the Attorney General is entrusted to make litigation decisions on behalf of the state in her discretion. That's her Article 5, Section 15 power as the state's chief legal officer. There's been no suggestion that there should be some additional review put in place in this or any other case. And bear in mind that the request is to force into the statute an exception for some employees, but the argument made that there ought to be some review somehow or if that's what's being requested, there's no question that the Attorney General has unfettered discretion to make these determinations as to the tens of thousands of other employees. So the argument seems to be that while we're disappointed with the decision in this case, therefore we should recognize an exception that doesn't appear in the statute for a broad universe of employees, although not that many compared to the tens of thousands who will continue under the other regime. Beyond this, excuse me, as to this particular case, I don't think it's relevant, but I'll make just a very brief mention. It cannot be, the argument disproves itself. If the theory is that whenever there is an allegation of willful misconduct, the Attorney General lies solely on the allegations in the complaint, then this would be a frequent, it would be the rule rather than the exception that the Attorney General would decline representation. And that simply isn't the case, and this very case proves it. Now, plaintiff makes much of the fact that Eckerdee, who is a state officer, and I'll be very brief on this because, again, I don't see this as relevant to the case before the court. But just to touch on it briefly, Eckerdee was also alleged to have engaged in willful and wanton misconduct. Now, I wasn't in the office at the time the determination was made. I cite to some articles in the brief simply describing that process that went well beyond looking at the complaint, but that's not in the record and needn't be because this isn't the issue before the court. But I would notice just on the face of the complaint, there are many differences between McFatridge and Eckerdee, the state trooper. McFatridge, but not Eckerdee, is alleged to have made multiple false press statements. McFatridge, but not Eckerdee, is alleged to have been at the head of the withholding of exculpatory evidence. McFatridge, but not Eckerdee, is alleged to have given false testimony in some PC proceedings. And it's McFatridge and not Eckerdee who's alleged to have intervened with the U.S. attorney on behalf of one of the witnesses in the case. So, while this is not before the court, in fact, on page 16 of their brief, they affirmatively disavow the notion that there should be administrative review procedures in place. I did feel it necessary to at least address very briefly the thoughts about this specific case.  I think it's important for the court to avoid partisan politics, which is what the appellate panel presumed. Not only flies in the face, as I've said, of Sundance Holmes and this proposition, it runs afoul of the whole notion that the attorney general is making critical legal decisions on behalf of the state every day, whether to defend statutes as constitutional, which would be an imperative of the legislature. Whether to defend members of the governor's staff and directors of agencies, which would be an imperative for the governor. The notion that this one statute in this one paragraph focuses on a potential bad faith by the attorney general is not only inconsistent with this court's prohibitions, but it would simply make unworkable the entire notion of the attorney general making these decisions on behalf of the state. And, indeed, to put a practical point on it, if the concern really were that the attorney general were going to, they wanted to insulate these folks from the attorney general's decision, why give them, and this goes to Justice Tice's question, why give the attorney general discretion to approve or disapprove the attorneys? Why give the attorney general the discretion to approve or disapprove the reasonableness of fees? That, that's obviously provided, and we all agree that's in the second paragraph of 2B, that flies in the face of any notion that they were trying to protect these folks entirely or insulate them from some sort of vindictive attorney general. Excuse me, and let, let me turn quickly to, to the sort of counter argument that's been made as a matter of policy here. The backstop is, it is relevant, and it, it is important. Obviously, at the end of the day, one can recoup one's fees. It's, it's one's legal defense fees. It's important enough that, as I said, our corporate code thinks it's good enough for office, officers and directors of corporations. And other states think it's good enough to use it, or not, I'm sorry, they use the different process of, of paying and recouping later, I apologize. But I should go on to say there's insurance, we've talked about it here, in response to the Chief Justice's question. There's nothing about these policies, nothing about these opinions from the federal appellate courts to suggest that a county can't or that it's a bad practice for a county to insure their state's attorneys. That's absolutely another backstop here. This isn't the only game in town, as this very case illustrates. Beyond that, there are the immunities that we discuss in our brief. And finally, and I think this case illustrates this too, that the opportunity to perhaps collect at the back end, provide some financial incentive for an attorney to represent a state's attorney or another, just as in the tort context, contingency is used, in the hopes that at the end of the day, one prevails and then receives full compensation. At the end of the day, the strongest policy arguments made in the amicus and in plaintiff's brief would favor a rule that singles out prosecutors specifically, not all elected officials, and not just elected prosecutors, but all prosecutors, for special protections. That is an argument that's properly made to the General Assembly. General Assembly can then, in the first instance, decide whether or not it's consistent with public policy and their constitutional obligations as legislators. And they can make that determination at the outset. What shouldn't be done is to ask this court to read in language into the statutes, to judicially amend the word employee, to disregard the legislature and what they did in 2C. In order to provide those protections, unbeknownst, without warning to the taxpayers, who would not have been aware when that statute was passed, that they could be on the hook for the legal defense fees of office holders who abused their office with willful and wanton misconduct in our later suit. Unless the court has any questions. Thank you. Thank you, Mr. Scodro, Mr. Eccle, for your arguments today. Case number 113676, McFatridge v. Madigan is taken under advisement as agenda number 8. Mr. Marshall, the Illinois Supreme Court stands adjourned until 9 a.m. Wednesday, January 23, 2013.